IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:04-CR-170 |
| | ) | (PHILLIPS/SHIRLEY) |
| LARRY LIST, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

This matter comes before the Court upon the defendant, Larry List's Motion To Suppress [Doc. 42]. The defendant filed a Memorandum of Law in Support of the Motion [Doc. 43] and the government filed a response to the Motion [Doc. 64] as well as a supplemental response [Doc. 89]. The parties further came before the Court for a suppression hearing on February 11, 2005. The government was represented by Assistant United States Attorney Hugh Ward and the defendant was represented by attorneys Ralph Harwell and Tracy Smith. The defendant was also present.

## I.  POSITIONS OF THE PARTIES

In his suppression motion, the defendant claims that any and all statements obtained as a result of the defendant's arrest on November 20, 2001, should be suppressed on the ground that the "defendant's physical condition and mental health were such as to render said statements unknowing and involuntary."  In support of the contention, defendant's Memorandum in Support of the Motion contends that "under the totality of the circumstances, Defendant's physical condition and mental health were such as to render any statements made on November 20, 2001, unknowing and involuntary."

While the defendant alludes to the following facts: (1) the defendant was arrested at gun point; (2) the defendant was surrounded by a large number of armed law enforcement agents; and (3) the agents advised the defendant as to "how much trouble he was in and how important it was for him to cooperate"; the defendant's sole stated basis for the Motion to Suppress is limited to his physical and mental condition. In this regard, defendant's Motion proffers the following additional facts:

> "That two and half months earlier, the defendant had been involved in a very serious motorcycle accident with injuries including a broken neck and a serious blow to the head, which required five days of hospitalization and subsequent rehabilitation; On November 20, 2001, the defendant was still undergoing medical treatment and was wearing a metal halo to stabilize his head and neck and was taking numerous prescription medications including narcotics and psychotropic medications."

The defendant argues that it is the government's burden to prove that the defendant knowingly and intelligently waived his right to silence and counsel. United States v. Bentley, 726 F.2d 1124 (6th Cir. 1984). The defendant argues that the "totality of the circumstances" standard is used for determining this issue. Brown v. Illinois, 22 U.S. 590 (1975). The defendant also contends that there are eight factors which need to be considered in making this determination, including the following:

1. Police coercion;
2. The length of the interrogation;
3. The location of the interrogation;
4. The continuity of the interrogation;
5. The suspect's maturity;
6. The suspect's education;
7. The suspect's physical condition and mental health; and
8. Whether the suspect was advised of his/her Miranda rights.

Withrow v. Williams, 507 U.S. 680, 693 (1993).

2

The government in its response, contends that the evidence in this case will show that the defendant and a "cooperating witness" had prior contact and conversations regarding defendant's purchase of a quantity of cocaine and prearranged a purchase/delivery of cocaine. Further that on November 20, 2001, the cooperating witness and defendant List met as prearranged and discussed the purchase of a kilogram of cocaine. That shortly thereafter, law enforcement officers confronted defendant List in the front yard, at which time defendant List was found to be in possession of a kilogram of cocaine, as well as a firearm.

The government contends that List subsequently agreed to allow officers into his home where he would, and did, make a statement and where he signed a consent to search his house. Further, during the search, the officers discovered a small amount of marijuana, a police detection device and another firearm. The government contends that the defendant was advised of, and signed a waiver of rights form and made a voluntary statement. Further the voluntary statement included an account of his prior criminal history, including a prior arrest for cocaine distribution and admissions regarding the acceptance of the cocaine in issue, possession of the firearm, and prior drug trafficking activities with co-defendant Roy Gibson.

The government agrees that the essential issue is the voluntariness of the confession and that this determination involves a totality of the circumstances analysis and a determination of whether the statement was the product of a full and unconstrained choice by the maker. Schneckloth v. Bustamante, 412 U.S. 218 (1973).

## II.  THE LAW

In determing the voluntariness of any statement including a confession, the parties correctly note that  the Court is to apply the totality of the circumstances standard in determing whether or not the statement was the product of an essentially free and unconstrained choice by its maker.  Schneckloth v. Bustamante, 412 U.S. 218 (1973).  As the government correctly notes the key issue is whether a confession occurred as a result of the defendant's will being overborne.  Ledbetter v. Edwards, 35 F.3d 1062, 1070 (6th Cir. 1994).

The government and defendant point out certain factors to be considered in evaluating the totality of the circumstances.  The factors include the nature and extent of any police coercion.

However, it appears to the Court that a finding of coercive government conduct is a condition precedent to a finding of involuntariness.  Colorado v. Connelly, 479 U.S. 157, 167 (1986); United States v. Gatewood, 230 F.3d 186 (6th Cir. 2000), cert. denied, 534 U.S. 1107 (2002); United States v. Macklin, 900 F.2d 948, 951-52 (6th Cir.), cert denied, 498 U.S. 840 (1990), United States v. Newman, 889 F.2d 88, 94 (6th Cir. 1989), cert. denied, 495 U.S. 959 (1990).

Further, in determining whether or not coercive government conduct occurred, the Court is to make an objective determination as to whether the actions of the officers were objectively coercive, and whether that coercion was sufficient to, and in fact did, overbear the will of the accused.  United States v. Denton, 246 F.3d 784 (6th Cir. 2001).

4

## III. SUPPRESSION HEARING TESTIMONY

The government called as its first witness at the suppression hearing, Special Drug Enforcement Agency ("DEA") Agent, Dave Lewis. After testifying as to his prior training and experience regarding drugs, investigation, counter surveillance, and interview techniques and observations, he also testified as to his ordinary and usual procedure with regard to interviewing suspects. In particular, he testified that he advises suspects of their constitutional rights in a manner which goes above and beyond the legal requirements. His "technique" includes not only obtaining an oral waiver from the suspect but also a written waiver on a DEA Rights Waiver Form. Agent Lewis testified that he shows the suspect the form, determines that he can read it and understand it, and then goes through the form line by line making sure that he understands each line before proceeding. He then goes to the "bottom line" and discusses the waiver aspect involved. He indicated that the DEA Waiver Form has two boxes to be checked which indicate that the suspect has read the form and the form has been read to the suspect. Agent Lewis indicated that after such a procedure, if the suspect is still willing to sign the written waiver, he has the suspect sign it with a witness present and then he begins his questioning.

Agent Lewis testified that the same procedure was followed with regard to defendant List. Agent Lewis testified that he had known Larry List for about eight to nine (8-9) years, having known of him and spoken with him back in the mid 1990's. He spoke with him "officially" in 1999 and again in 2001. When he spoke with him in 1999, Mr. List's demeanor was one of a normal adult with regard to communication and included his being articulate, intelligent, not intoxicated, or mentally impaired. From 1999 until 2001, Agent Lewis occasionally saw and observed Mr. List inasmuch as they live in the same subdivision.

5

Agent Lewis testified that prior to November 20, 2001, the FBI had been in contact with a confidential informant, who indicated that he had telephone calls with defendant List and that defendant List had expressed a desire to obtain at least one kilogram of cocaine. The confidential informant was to provide that kilogram. On November 20, 2001, the confidential informant and Mr. List met at Mr. List's residence, then drove off from the residence, and later returned to the residence. Agent Lewis testified that the confidential informant did provide Mr. List during that time period with the kilogram of cocaine and when Mr. List exited the confidential informant's vehicle and headed toward to the house with the kilogram of cocaine, he was arrested. Agent Lewis testified that he was present at that arrest and conducted the subsequent interview.

Agent Lewis testified with regard to the defendant List being taken into custody, that Mr. List did in fact have a kilogram of cocaine in his hands when confronted and initially handcuffed and also had on his person a .25 caliber semi-automatic weapon.

Agent Lewis described this transaction as a "reverse-drug-transaction," in which a person after indicating a pre-disposition and desire to commit a crime, is given the opportunity to commit the crime by the government.

Agent Lewis testified that because defendant List knew him, the defendant, after being taken into custody "gravitated" toward him and wanted to talk to Agent Lewis rather than anyone else. Agent Lewis indicated that in their initial encounter, he advised defendant List "Larry, we need to talk about this situation, and we will give you an opportunity to talk, if you want to." Agent Lewis indicated that the defendant expressed an agreement to this and when Agent Lewis asked if they could go inside and talk, that defendant List invited him and all the officers into his house.

6

Agent Lewis testified that defendant List's demeanor was the same on that date as it had been in 1999. He further specifically testified that there was nothing to indicate that the defendant was not in control of his faculties or did not know what was going on. He did confirm that physically, he had a brace or a halo on his head allegedly as a result of a motorcycle accident, in which he had broken his neck. However, based on Agent Lewis's observation and opinion, the defendant was not impaired mentally at the time of the arrest on November 20, 2001, and in fact appeared to be mentally the same as he had been in 1999. Agent Lewis further testified that after being invited into the defendant's residence, they went to the kitchen and sat at the kitchen table. Agent Lewis then briefly told the defendant what he would like to do, advised him as to what was going on, what he was being arrested for, and gave defendant List the opportunity to assist and cooperate. After that brief statement, he informed the defendant of his <u>Miranda</u> rights and went over and obtained a written waiver.

Agent Lewis testified that defendant List really wanted to talk and in fact was so willing to talk, that Agent Lewis actually had to slow him down in order to follow his normal procedures.

The government provided as Exhibit 1 to Agent Lewis's testimony, the DEA Statement of Rights and Waiver Form that was signed by the defendant List, by Agent Lewis, and by Don White. It was dated November 20, 2001, with a time of 4:35 p.m. Agent Lewis testified as to the information provided on the form and the extent to which he went over that information with the defendant List. He also noted that defendant List had checked both boxes, indicating that he had both read the form and that it had been read to him. It also indicates the time of custody being 4:30 p.m. and the time the form was signed being 4:35 p.m. Agent Lewis did confirm that there was

some short time lapse from the time the Waiver was signed until a tape recorded interview occurred and that the lapse was due in part to having to go out to the vehicles and secure a tape recorder. Agent Lewis also testified that Knox County Officers, DEA Agent White, and FBI agents, were inside the house.

The government also entered as Exhibit 2, the DEA Consent to Search Form signed by defendant List and dated November 20, 2001 at 4:30 p.m.

Agent Lewis then testified with regard to the recorded interview and entered as Exhibit 3A the original tape of the interview of Mr. List, which was played in Court, and Exhibit 3B a transcript of the tape which the Court notes to be quite accurate when compared to listening to the tape. The tape notes that the date of the interview is November 20th and the time of the interview starts at 10 minutes before 5:00 o'clock (or 4:50 p.m.).

Agent Lewis testified that in this particular case, a recording was made for two reasons. First, because this was a "reverse-transaction" and the government has a greater burden to prove the defendant's willingness and intent to commit a crime, it is important to get the information recorded. Furthermore, defendant List was willing to speak and have his conversation recorded.

Agent Lewis also testified that during the search of the residence, they found another pistol and a "bug detector," which is an electronic device apparently designed to detect if a person is "wired" or "bugged" and they also found a small amount of marijuana.

On the tape, the defendant admitted that he had a loaded .25 automatic pistol on him that day, which he claimed was for protection from dogs when he goes on a walk. He also admitted that he was attempting to possess a kilogram of cocaine on that day. He acknowledged having to

8

pay for the cocaine "at some time" with prices ranging from $18,000 to $25,000. However, his plan was allegedly to obtain the cocaine on credit and give it to another person who would then sell it and give him some money back. He denied that he was going to obtain the money at the time he delivered it to this other person. Rather, he was having a kilogram of cocaine "fronted" to himself and then he was going to "front" it to somebody else. Agent Lewis also testified regarding the defendant's previous arrests in New York and confirmed that defendant had signed a written consent to search and at the same time denied any drugs being present in the house or any weapons other than a rifle. Agent Lewis testified that the defendant discussed his prior arrests and his negotiations with a Danny Gibson, the person who delivered the kilogram of cocaine. He further discussed his association, of lack therewith, with a Mr. Roy Gibson and his prior discussions with Danny Gibson. At one point, Agent Lewis confronted him with the fact that these telephone conversations had been monitored and that Mr. List's version of them was not accurate. They discussed the extent to which Mr. List was or was not "excited" about getting the cocaine and his concern with regard to getting some money for the drugs. Defendant also continued to state that he was not going to sell the drugs but was going to give them to the other person "Rick" who was going to sell them. He did confirm that he was going to receive money for it but was not going to actually be involved in the selling. They also discussed the prospect of defendant List calling up and making arrangements with this other fellow "Rick," although it would later develop that "Rick" showed up at defendant List's residence during the actual interview. With regard to the defendant's physical and/or mental condition, the only relevant statements on the tape/transcript are as follows:

"LIST: Yeah. David, I don't have, I don't get this, I'm not going to lie to you. I'm not going to tell you any stories here. I've been caught with a serious situation.

LEWIS: Uh, huh.

LIST: No question about it. Uh, my health and my finances are not going to allow me to do anything but help you. Period.

LEWIS: Well, that's not true. Now, you have, certainly have the, you have the choice. . . .

LIST: No, but I mean, what I'm saying, in my mind, those are my choices.

LEWIS: How much longer are you suppose to be wearing your, uh. . .

LIST: Another two months. Month. I went to the doctor last Thursday and, uh, he said it could be as little as a month, up to two months. So I don't. . . .

LEWIS: You're progressing. . .

LIST: Yes, I am. Really well. Uh, huh.

LEWIS: What actually is the, uh, the injury? You broke what?

LIST: I broke the C-1 and C-2 vertebrae in my neck. I crushed them.

LEWIS: Uh, huh. Are they, they're healing?

LIST: No, not yet.

LEWIS: Uh, huh. What will happen after you have the halo off?

LIST: Well, we don't think maybe, uh, if it don't heal any better than it has, David, I have to have a bar cut from the top of my, bottom of my neck, uh, my head, to the 4th and 5th vertebrae in my neck.

LEWIS: Uh, huh.

LIST: To fuse all that together.

LEWIS: Uh, huh.

LIST: And hopefully it will, it will fuse itself together.

LEWIS: But it doesn't appear that you have any paralysis.

LIST: No, I don't have any paralysis,

LEWIS: Which is good, huh?

10

LIST: It's fantastic. I'm very lucky. Very lucky."

In addition, the defendant testified that he did not use illegal drugs and did not smoke marijuana. He did indicate that he took drugs for epilepsy but that he could not do drugs or use alcohol or anything as a result thereof.

"LEWIS: Have you ever, I know you're on lots of pain mediation now. . .

LIST: Uh, huh.

LEWIS: Do you give him some of your pain mediation?

LIST: No. Absolutely not."

The tape contains considerable additional statements and facts which may arguably be relevant and germane to trial of this case. However, for purposes of this suppression hearing and the defendant's Motion to Suppress, the above is the primary evidence that relates to the defendant's physical and mental condition at the time of the statement.

On cross-examination, defense attorney established that Agent Lewis had been a neighbor of defendant List at least for two years, prior to the date of arrest. He also brought out that other law enforcement officers had been in the subdivision earlier that day in a surveillance vehicle and that Agent Lewis had met with the informant earlier that day and prior to his picking up Mr. List. Agent Lewis had been a witness to two prior telephone calls between the informant and defendant List earlier that day and Agent Lewis had heard List say that there was a van in the subdivision that he thought was suspicious and that he was going to check it out. Lewis said that it was based on that observation, that List later said that he still wasn't sure whether everything was right and requested the informant to come and pick him up and that they would leave and drive somewhere else.

Agent Lewis indicated that he was about thirty (30) feet from defendant List at the time that he was taken into custody. Agent Lewis denied that defendant List had a cane and stated that defendant List was not taken to the ground, but was simply given commands. He also indicated that he believed only one officer had his weapon drawn and none were drawn when they entered the house.

Agent Lewis testified that after they went to the kitchen table, Mr. List was across the table from him and Agent White, and that no interrogation occurred and no questions were asked before <u>Miranda</u> rights were given.

Agent Lewis again confirmed that the defendant had a halo on and that although he was initially handcuffed, these were removed shortly after the officers and Mr. List went inside the home. He also noted that while there are some comments on the tape and in the transcript indicating some statements having been made prior to the tape being turned on, these statements were nonetheless made after <u>Miranda</u> rights were given. Furthermore, Agent Lewis confirmed that the defendant never complained or said anything regarding his physical condition or his mental condition, nor did he indicate he was depressed or anything like that. Lewis confirmed that he read the Rights Waiver to List, line by line and discussed taping their conversation.

Agent Lewis explained that the statement on the tape where he says to defendant List "I know you're on lots of pain mediation," was just a general statement and he did not actually have any prior knowledge of what pain medication the defendant was actually on. With regard to defendant List's actual overall condition, however, Agent Lewis testified that List looked him in the eye, spoke clearly, answered appropriately, had no slurred speech, and appeared in full control of

his faculties. He again confirmed that defendant List was no different than when he had discussions with him in 1999. He then went over the 1999 discussion and its nature and purpose.

On re-direct examination, Agent Lewis indicated that defendant List was ultimately not arrested.

On re-cross examination, there was a debate as to whether or not Mr. List was "not arrested" or was arrested and then "unarrested."

Exhibit 5 was produced which was an initial appearance waiver.

The government next called Officer Don White, who is a Lenoir City Police Officer but is also a member of the task force with the Drug Enforcement Administration. After discussing his training and experience and job duties, including interviewing, he discussed his role on November 20, 2001 and his partnering with Agent Dave Lewis and involvement with the undercover confidential informant. He noted that his role was to be staged at a nearby school and then when Mr. List and the informant returned, he was part of the arrest team. He confirmed that the Knox County Sheriff's Deputies found a gun on the defendant and that the drugs were in brown bag.

Officer White indicated that the defendant's demeanor was relaxed and calm, that List spoke to Agent Lewis in a light tone, that he did not appear to be angry or impaired in anyway, and rather, appeared perfectly normal, spoke coherently, and replied appropriately.

Officer White confirmed that the defendant invited the officers into the house and that it was the defendant who stated that he wanted to go into the house because of the neighbors. He also confirmed the signing of the Waiver and testified as to the routine that Agent Lewis went through, including reading the entire form and having the defendant read along, and then having the defendant check off the blocks and fill in the blanks. He also confirmed that no questions were

13

asked of the defendant before being Mirandized, although List was "eager to get on with it."

Officer White confirmed that the defendant was calm, acted normal, gave permission to search the house, and signed a form to that affect. He also noted that Agent Lewis asked Officer White to go get a tape recorder from his truck, which he did. He briefly discussed the interview and noted that the statement ended when the person who was going to buy the cocaine actually showed up at List's house.

Officer White indicated that during the interview, there was no evidence of any impairment and that List appeared normal. At the end, he signed a Waiver of Initial Appearance (Exhibit 5) and that ultimately he was not arrested that day.

On cross-examination, Officer White confirmed his involvement with the drug task force since 1999 and his DUI training, ability to recognize impaired people, tests, and indicators used in that process. There were numerous questions regarding his involvement in the events leading up to the November 20th arrest and various discovery-type questions concerning the location and involvement of other officers in and around the scene.

With regard to the issues involved in this motion, Officer White testified that when the defendant got out of his car, he had the bag of cocaine, and was wearing some kind of jacket. Officer White could recall no problems that the defendant had in getting out of the car. He recalled that the defendant was approached by the Knox County Sheriff's Deputies but that he could not recall if any guns were out. He did confirm that defendant List was not taken down and was searched standing up. He also saw a gun taken from List's pocket by one of the deputies. He did confirm that defendant List and Agent Lewis had a brief conversation in the driveway, but that he could not recall any statements that were made. Officer White confirmed that after defendant List

was read his <u>Miranda</u> rights and after he signed the Waiver, he had a brief conversation with Agent Lewis approximately ten minutes in length before it was decided to tape his statement in full. During those ten minutes no discussion was had regarding the defendant's physical condition. In particular, he confirmed that suicide was never mentioned. He also indicated that somebody stayed with Agent Lewis and defendant List while Officer White went to get the tape recorder and that the defendant did not oppose the taping of his statement in any way. He confirmed there was no discussion regarding pain medication except the one excerpt on the tape. Other questions were asked regarding the search and results thereof, and matters concerning an RF device but these are not relevant to the inquiry associated with this motion.

The government's final witness was former FBI Agent Lou Tosti, who confirmed that he retired from the FBI after 33 years of service. He discussed his training experience and the fact that he had interviewed thousands of people and could tell when they were impaired. He noted the factors that he looked at including, the person's demeanor, their willingness to talk, the way they talk, whether or not they are emotionally distraught and their eye contact. He discussed the background regarding the investigation into defendant List and the Gibsons and prior recordings. He had listened to tapes of defendant List prior to his injury and prior to his arrest and described his demeanor as glib and one who got his point across. He also had listened to the tapes after his injury and nothing in his voice indicated that he was impaired. He was further questioned with regard to matters leading up to the actual "drug reverse" and surveillance measures taken and other facts involving matters pre-arrest.

At the time of the arrest of defendant List in his driveway, Officer Tosti felt like the defendant was very cooperative and he invited them in. He conceded that the defendant was

15

impaired to some extent physically with regard to the halo brace but stated he was not mentally impaired. He indicated defendant List sounded like the same person that he had heard on the telephone tapes and he answered questions appropriately. Agent Tosti was also present during the giving of the <u>Miranda</u> warnings and the search pursuant to consent. He was in and out during the interview but his voice does appear once on the tape. Questions were asked regarding the search and what was found and regarding the other person showing up get the cocaine at the end of the tape.

On cross-examination, he was asked questions about the background investigation prior tapes and conversations and telephone calls and planning the day before. He also confirmed that not only was he there when the defendant was advised of his constitutional rights but he had heard Agent Lewis talk with defendant List before the tape was started and that Agent Lewis was primarily tying to get defendant List to wait until he had been fully advised before making any statements. He did not recall anyone saying anything similar to "I don't want to hear that on that tape."

Finally, Agent Tosti stated that the defendant did nothing to indicate that he was despondent or considering suicide and that he later called defendant List to remind and advise him of his need for an attorney and to come in and continue the investigation.

After the government rested, the defendant through counsel, made a proffer of Exhibit 6 being a list of prescription medication from the Kroger pharmacy. It was stipulated by the government that these prescriptions were prescribed but it was not stipulated nor testified to, as to whether the defendant actually took any of the prescriptions, in what quantities or when. However, it was stipulated that if Mrs. List were called, she would state that she took them home and put them

in daily doses and Mr. List took them. There was not any stipulation or any testimony as to whether or not any medicine was taken by the defendant on November 20, 2001 or when. The defendant also attempted to proffer a calendar of the calendar year 2001 showing the numbers of prescriptions and dosages for each day but this was withdrawn by defendant apparently in light of the Court's questions concerning a lack of prescription information, dosage information, or frequency of dosages, and the calendar only contained a break down of dates and drugs.

The defendant's argument, at the end of the proof, was that the burden was on the government to prove that his statements were made knowingly and voluntarily. The defendant's attorney pointed out that the defendant was injured and that he had been prescribed mediation and that the doctor who had prescribed the medicine might have been able to testify regarding the effects of the drugs, was now dead. He claimed that on the date of the incident, the defendant was concerned that something was amiss and that he was being surrounded by officers, and defense counsel opined that his statement often makes no sense. He stated that the statements made by the defendant were those of one not thinking rationally and that this was attributable to the amount of drugs he was taking.

Defendant's attorney indicated that the coercive conduct involved would include the defendant's physical impairment, coupled with the number of officers involved and threats made to him.

In closing, the government argued that the defendant voluntarily gave up his rights three times, once when going in, once in anticipation of the recording when he signed the waiver, and the third time at the end of the statement. The government contends that the Waiver and Miranda rights given suffice to indicate his voluntariness and knowledge. Furthermore, the

testimony of Agent Lewis, who knew this defendant and had spoken to him in 1999, indicated that he was the same in 2001 and that he was trained to know those very types of things.

Finally, the government argues that the defendant must show coercion by the officers/agents and that the proof in this case was that the officers did not coerce the defendant, but rather went out of their way not to. The government also argued that the defendants mental condition is only a factor for the Court to consider with regard to voluntariness. The government also noted that the defendant could have called any doctor to testify regarding the effect of prescriptions on Mr. List and had failed to do so.

Finally, the government noted that listening to Mr. List on the tape revealed that he was coherent and had no symptoms of impairment.

## IV. ANALYSIS

The Court will address the overall "voluntariness" issue and the knowing and intelligent waiver issues under the totality of the circumstances approach. The Court will also address the defendant's only stated basis for suppression, the "physical condition and mental health" of the defendant.

### A. Analysis of Suppression Testimony

With regard to defendant's physical and mental condition at the time of the statement and based on my listening to the tape, it appears to the Court that the defendant was quite articulate and intelligent, had a good memory and was coherent and able to converse with relative specificity. He was able to explain, articulate, and clarify various positions, including the precise vertebral location of his injury and nature of his fusion surgery. At one point, it appeared that he was laughing (when he stated at the bottom of page 19 of the transcript, "I have got nothing to hide, man.")

18

Mr. List was very specific with regard to his admissions and very assertive regarding his denials. The Court feels that the defendant gave every indication of being very lucid, cogent, and clear with regard to his statements. There is no evidence that he was under the influence of any physical or mental disability or laboring under any adverse physical or mental condition, which would affect his mental and emotional condition relative to this statement. There is no indication that he was on any kind of drugs or medication or if he was, no evidence they were affecting him with regard to his ability to speak or remember things, no evidence of slurring, thick-tongued speech, or other speech abnormalities. To the contrary, it appears to the Court that in most respects, Mr. List appeared eager to give information to Agent Lewis.

## B. Analysis of Withrow v. Williams Factors

The defendant cites Withrow v. Williams, 507 U.S. at 693, for the proposition that eight factors are to be considered in determining if the defendant's statement was voluntary or involuntary.[1] Based on the defendant's motion and brief, the defendant apparently relies only on factor no. 7, "the physical condition and mental health of the defendant." While this has been touched on in the immediately proceeding section and will be further covered in the immediately following section, the Court will briefly address the remaining seven factors in light of the "totality of the circumstances" analysis that it is required to conduct.

Factor no. 1 is police coercion. Id. While there was evidence of the presence of several law enforcement officers and an arrest with at least one gun initially drawn and while the

---

[1]The Sixth Circuit has enunciated similar relevant factors including "the defendant's age, education and intelligence; whether the defendant has been informed of his constitutional rights; the length and extent of the questioning; and the use of physical punishment such as deprivation of food or sleep," United States v. Mahan, 190 F.3d 416 (6th Cir. 1999). Under those factors, the result would be the same.

19

defendant was temporarily handcuffed, the Court finds that there was no evidence of objective coercion, which could even remotely be considered to have overborne the will of the defendant. This is particularly true at the time period immediately preceding and during the defendant's executing of a written waiver of his rights and executing a consent to search, and making of a statement. The evidence indicates that the defendant was seated at his own kitchen table with Agent Lewis sitting across from him. The conversation and testimony indicated that the defendant knew Agent Lewis as a neighbor and had talked to him about another "legal matter" in the past, and that he appeared eager to talk and as noted conversed clearly, lucidly and intelligently. His handcuffs had been removed and there was no evidence of any guns being drawn or visible or any other evidence of a coercive environment. Quite simply, there was no objective proof of any coercion by law enforcement, let alone coercion sufficient to overbear his will. If anything, his will appeared to be as that of one ready, willing, able, and eager to give a statement and have it recorded and he was simply allowed to do so. The only remotely coercive activity appeared to be an attempt to slow him down. There was no showing of objective coercion, and there was no testimony of defendants subjective beliefs.

    This "coercion" factor is particularly important because as noted in the heretofore cited cases, evidence of law enforcement coercion is a condition precedent to an finding of involuntariness. (See Connelly, 479 U.S. at 167 and Gatewood, 230 F.3d 186, etc.). And even if there was any coercion, there was no showing it was sufficient to overbear defendant's will or that it was the motivating factor in defendant's decision to make the statement. See McCall v. Dutton, 863 F.2d 454, 459 (6th Cir. 1988). In light of the finding of no coercion, the Court could arguably conclude its analysis at this point, however, I will continue.

The second factor is the length of interrogation.  <u>Williams</u>, 507 U.S. at 693.  Here the questioning of the defendant lasted only thirty-five (35) minutes (from 4:50 p.m. to 5:25 p.m.).  Thus, the brevity of such interrogation does not establish any evidence of involuntariness, defendant's will being overborne, or coercive interrogation.  Rather, it argues to the contrary.

The third factor, the location of the interrogation, also argues against involuntariness or coercive environment.  <u>See</u> <u>id.</u>  Defendant was seated in his own house, where he had requested to go, and was sitting at his own kitchen table and was not restrained.  He was not questioned at a police station, in a small room, in a foreign environment, under bright light, or any other arguably "coercive" environment.

The fourth factor is the continuity of the interrogation.  <u>Id.</u>  But for one brief interruption during the recorded interview, the questioning was continuous and relatively short.  There were no multiple attempts at questioning at different times, at different locations, or by different people using different modes of interrogation.  It was basically a conversation between the defendant and Agent Lewis.  This factor also argues for voluntariness and establishes no evidence of involuntariness or coercive environment.

The fifth factor, the defendant's maturity, likewise argues against involuntariness as the defendant is a mature grown adult.  <u>See</u> <u>id.</u>  Furthermore, he had previously been arrested in New York with charges being dropped due to his cooperation with law enforcement, relative to his sale of a quarter pound of cocaine.  Thus, he was not unfamiliar with this type of situation.  He is not an immature juvenile, nor was there any evidence produced of any physical, mental, or emotional immaturity, which would call into question his knowing exactly what he was doing and the voluntary nature of the same.

21

The sixth factor is the defendant's education.  Id.  There was no evidence that the defendant was uneducated and to the contrary, his speech, and vocabulary were indicative of a fairly well-educated man.  Thus, his level of education does not support or establish any evidence of involuntariness or lack of knowledge as to what he was doing.

The seventh factor will be discussed later.

The eighth factor is whether the defendant was advised of his Miranda rights.  Id.  The evidence is abundantly clear that the defendant was so advised of these rights and that Agent Lewis painstakingly went over the waiver of rights with the defendant prior to the defendant signing the same.  This clearly establishes the knowing and voluntary nature of the defendant's actions.

### C.  Defendant's "Physical Condition and Mental Health"

Defendant's primary, and arguably sole, basis for suppression rests on the seventh Williams factor of defendant's physical condition and mental health.  See id.

The defendant's position regarding physical condition is based on the following facts:

1.  The defendant was in a serious motorcycle accident on September 5, 2004, and sustained a head injury and broken neck,

2.  The defendant was hospitalized for five (5) days and later was treated at Patricia Neal Rehabilitation Center,

3.  The defendant was, at the time of the arrest and statement, still undergoing medical treatment for his injury,

4.  The defendant was taken numerous prescription medications, including narcotics and psychotropic medications.

While the Court accepts defendant's contention of the seriousness of his accident and injuries some two and half (2 ½) months prior to this incident and the giving of the statement, the simple fact remains that there was no evidence introduced at the hearing to show that the defendant's

physical condition or mental health in any way affected his knowledge, voluntariness, or desire to give a statement. Nor was there an proof introduced to establish that his physical or mental condition in any way affected or reduced his "will" such that it might be easily or otherwise considered to have been overborne by the actions that occurred in this case.

While the defendant was admittedly in a halo brace, there was no evidence that this affected his ability to know what he was doing, or that it affected the voluntary nature of his actions or statement, or that it affected his "will" or will power. To the contrary, the evidence established that he was physically able to arrange for this "drug deal," to travel with the cooperating witness in a vehicle, to get in and out of the vehicle without much, if any problem, to obtain and carry a kilogram of cocaine, to carry a loaded gun on his person during the transaction, and it appears that he may have also been able to have gone walking in the neighborhood earlier that day, perhaps to check out a "suspicious" van, which he had observed. The evidence indicates defendant has the physical ability, mental ability, and capacity to participate in a drug transaction. I find he likewise had the capacity to knowingly and voluntarily admit to such participation.

There was no evidence that the officers physically accosted, injured the defendant, or adversely affected his physical condition. Nor was there any evidence that the defendant was at any time in pain, or even physically uncomfortable.

With regard to his mental health, the testimony of the three (3) law enforcement officers/agents was to the effect that there was no evidence of any mental impairment. As previously noted, after listening to the defendant's voice and statement in its entirety, I could not detect any evidence of a mental or emotional impairment. Further, the defendant offered no proof, medical or otherwise, that the defendant had any actual mental health problems or was laboring

23

under a mental impairment.[2]  The only proof in this regard, is that the defendant's attempt to relate

his being on prescription and pain medication to the defendant being in an unsound, irrational state.

However, the defendant did not put on any proof regarding this effect, if any, of the actual

medication, if any, that the defendant was actually taking on November 20, 2001.  To find that any

such medication so severely affected the defendant as the defendant's attorney contends, in the

absence of any such proof, would require a leap into the realm of total supposition, surmise and

guesswork.  Such a finding would also be contrary to the credible testimony of the three (3)

eyewitness officers who testified as to their contemporaneous observations of the defendant.

Finally, such a finding would be contrary to and would belie the nature of the actual audible

recorded statements of the defendant heard by this Court.

   However, even if defendant was laboring under "some" effect of medication, that

alone would not warrant suppression for two (2) reasons.  First, there is the absence of the requisite

showing of coercion by law enforcement.  Second, under a totality of the circumstances analysis,

that factor does not establish that defendant's statements were made involuntarily, unknowingly or

unintelligently, or that it deprived him of his free will or overborne his will.  There was no showing

that his mental state was so weak that it was overborne by alleged (but non-existent) coercion.

---

[2]While defendant's attorney noted that the doctor who prescribed the defendant's medication was since deceased and could have testified to the effect of such drugs on defendant, defendant's attorney offered no reason why he could not have called any number of other doctors, including other treating doctors of defendant, or pharmacists, to testify as to the nature and extent of the medication the defendant was actually taking on the date of the incident and giving the statement. Further no reason was offered why their opinions could not be given regarding the effect of such mediation on the defendant's mental condition and ability to know what he was doing.  Absent such proof or evidence, the Court cannot divine what such efforts, if any, such medication had on defendant at the time he gave his statement.

24

Thus, I find there is no factual support for a claim that the defendant's mental health or physical condition in any way affected his mental or emotional condition, or his "will" relative to the giving of his statement and to his signing the waiver of rights and the consent form. Nor is there any evidence to indicate that his statements made and waivers signed were done other than fully voluntary and knowingly. Rather the totality of the circumstances clearly indicates that defendant List's statements and his execution of the waiver of rights form and consent to search form, were given voluntary, knowingly, and intelligently, and that his will was not overborne by any action of any person, or affected by any physical condition, or mental health condition. I find his statement was made as the product of a free or deliberate choice rather than from intimidation, coercion or deception. Likewise, the waiver was made with full awareness of the rights being given up and the consequences of such decision.

25

## CONCLUSION

After carefully considering the evidence introduced during the course of the evidentiary hearing, and after reviewing the relevant legal authorities, it is clear to the undersigned that there is no basis to suppress any evidence seized, or statements made, in this case. For the reasons set forth herein, it is **RECOMMENDED** that defendant's Motion to Suppress Evidence [Doc. 42] be **DENIED**.[3]

Respectfully submitted,

___s/ C. Clifford Shirley, Jr.___
United States Magistrate Judge

---

[3]Any objections to this report and recommendation must be filed with the clerk of the court within ten (10) days of receipt of this notice. Such objections must conform to the requirements of Rule 72(b), Fed. R. Civ. P. Failure to file objections within the specified time waives the right to appeal the district court's order. See Thomas v. Arn, 474 U.S. 140 (1985). The District Court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive or general. Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).

26